**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING DEFENDANT'S** |
| | ) | **MOTION TO SUPPRESS EVIDENCE** |
| vs. | ) | |
| | ) | |
| Kyle Ray DeCoteau, | ) | Case No. 4:08-cr-037 |
| | ) | |
| Defendant. | ) | |

_____

Before the Court is the Defendant's motion to suppress evidence filed on January 28, 2009.
See Docket No. 33.  On February 6, 2009, the Government filed a response in opposition to the
motion.  See Docket No. 36.  An evidentiary hearing was held on March 11, 2009.  Persons who
testified at the suppression hearing included FBI Special Agent Ryan O'Neil, Mabel DeCoteau, and
Dr. Peter C. Peterson.  For the reasons set forth below, the Court denies the motion.


I.      **BACKGROUND**

On March 11, 2008, Bureau of Indian Affairs Special Agent Wayne Thomas received a
report from the Turtle Mountain Child Welfare Services that a minor child had been sexually
molested by the defendant, Kyle DeCoteau, within Indian country.  On March 24, 2008, Agent
Thomas and FBI Special Agent Ryan O'Neil interviewed DeCoteau regarding the alleged sexual
abuse.

Agents O'Neil and Thomas met DeCoteau at the Belcourt Police Department in Belcourt,
North Dakota at approximately 1:30 p.m.  The agents wore plain clothes, and did not display their
weapons.  Agents O'Neil and Thomas led DeCoteau to an office where DeCoteau was provided a

seat closest to the door.  The door was left unlocked and slightly ajar during the interview. DeCoteau was not handcuffed or physically restrained in any manner.

Agent O'Neil first informed DeCoteau that he wanted to visit with him about a sexual assault that DeCoteau allegedly witnessed involving DeCoteau's girlfriend. This line of questioning took approximately 2-5 minutes.  Agent O'Neil then informed DeCoteau that he also wanted to question him about allegations of sexual abuse made against DeCoteau.  Before questioning DeCoteau, Agent O'Neil informed DeCoteau that the interview was voluntary, he was not under arrest, he would not be arrested at the conclusion of the interview, and he was free to leave at anytime.  DeCoteau was not advised of his *Miranda* rights.

FBI Agent O'Neil then questioned DeCoteau as to whether he had any sexual contact with minors S.S. and R.L.  DeCoteau repeatedly denied that he had any sexual contact with the young girls.  However, DeCoteau said that one of the minors (R.L.) had acted in a provocative manner towards him.  After further questioning by Agent O'Neil, DeCoteau admitted that it was "possible" something happened with one of the minors.  Thereafter, DeCoteau admitted having sexual contact with S.S., a minor who was just six-years old at the time.  Agent O'Neil testified that DeCoteau stated S.S. had guided his hand to her vaginal area, inserted his finger into her vagina, and he had pressed his penis against her vaginal area during the sexual encounter.  DeCoteau also admitted that the young girl had grabbed his penis during the encounter.  At some point during the interview, DeCoteau asked the agents if his grandmother could join him during the questioning.  Agent O'Neil informed DeCoteau of their policy which prohibits a third party from participating in an interview unless the person has first-hand knowledge of the incident.  Agent O'Neil said that DeCoteau said he understood why his grandmother could not be present.

2

Agent O'Neil next asked DeCoteau if he would be willing to provide a written statement concerning the sexual encounter. DeCoteau informed the agents that he could not read or write. Agent O'Neil asked DeCoteau if he would be willing to provide a tape-recorded statement and DeCoteau agreed to do so. An eight-minute recorded statement was taken. <u>See</u> Government Exhibit No. 1. The recorded statement is essentially a summary of what transpired during the initial interview of DeCoteau. At least twice during the audio recording, Agent O'Neil reminded DeCoteau that his statement was voluntary, he was not under arrest, and he was free to leave at anytime. At the conclusion of the interview, DeCoteau left the law enforcement center and returned to his vehicle. The undisputed evidence reveals that the entire interview lasted approximately thirty (30) minutes.

At the time of the interview, DeCoteau was 24-years old, a high school graduate, and was living in an apartment with his girlfriend and her two minor children. DeCoteau has been a ward of his mother since his eighteenth birthday pursuant to a Tribal Court order which established guardianship. His grandmother, Mabel DeCoteau, became a co-guardian on March 25, 2008, which was the day after the interview took place at the Belcourt Police Department. The evidence reveals that FBI Agent O'Neil was not aware of the defendant's guardianship status at the time the interview was conducted, nor was he aware of DeCoteau's mental condition.

Mabel DeCoteau testified at the suppression hearing on March 11, 2009. Mabel DeCoteau is the defendant's grandmother and she resides in Belcourt, North Dakota. Mabel DeCoteau said the family became concerned about Kyle DeCoteau's mental functioning at an early age. During his pre-school years, DeCoteau was referred to specialists in Grand Forks for evaluation. Kyle DeCoteau was diagnosed with mild mental retardation at the age of five.

Mabel DeCoteau said that on March 24, 2008, Kyle DeCoteau was living at the Willow Manor Retirement Home in Belcourt. This is a housing unit for the elderly and physically or mentally disabled persons. She said Decoteau moved into that facility on December 27, 2007. DeCoteau was supposed to be living alone at the Willow Manor Retirement Home, but he had been living there with his girlfriend and her two young children since December 2007.

On March 24, 2008, Mabel DeCoteau said she and Kyle DeCoteau drove to the Belcourt Police Department along with DeCoteau's girlfriend and her two minor children. Mabel DeCoteau said Kyle DeCoteau and his girlfriend walked into the Belcourt Police Department while she remained in the car with the two children. Mabel DeCoteau was uncertain how long her grandson was in the police department, but she said it seemed like a long time. At some point that afternoon, Mabel DeCoteau walked into the Belcourt Police Department to check on her grandson. She was unable to locate him but she did have a brief conversation with another law enforcement officer she encountered by the name of Officer Rod Trottier. Mabel DeCoteau said she requested that Officer Trottier check on her grandson, which he did shortly thereafter. Mabel DeCoteau said her grandson was very fearful of law enforcement officers, and she could tell that he was upset after he returned to the vehicle at the conclusion of the interview.

The last witness who testified at the suppression hearing was Dr. Peter C. Peterson. Dr. Peterson is a clinical psychologist employed at Medcenter One in Bismarck, North Dakota. Dr. Peterson has been employed in that capacity for the past 25 years. Dr. Peterson testified he saw Kyle DeCoteau on December 3, 2008, and February 13, 2009, for a psychological evaluation. Dr. Peterson administered a battery of psychological tests and also reviewed DeCoteau's medical

4

records, psychological evaluations, academic records, and psychological tests that were administered to DeCoteau in school.

Dr. Peterson said Kyle DeCoteau was diagnosed at an early age with mild mental retardation and attention deficit disorder. Dr. Peterson said a diagnosis of mild mental retardation is primarily based on an individual's IQ. A person is classified as mildly retarded if they have an IQ in the range of 50-75. Dr. Peterson said he administered a battery of psychological tests to DeCoteau on December 3, 2008. Those tests confirmed that DeCoteau has mild mental retardation. DeCoteau has a verbal IQ of 56, a performance IQ of 67, and a full-scale IQ of 57.[1] Dr. Peterson said DeCoteau's reading and spelling skills are at the pre-kindergarten level, and his math skills are at a first grade level. Dr. Peterson confirmed that DeCoteau is unable to read or write, although he graduated from high school.

According to Dr. Peterson, DeCoteau is of low intelligence. Dr. Peterson said he conducted a follow-up evaluation on February 13, 2009, which again confirmed DeCoteau had a full-scale IQ of 57. Dr. Peterson said DeCoteau has serious comprehension problems and he would probably be unable to understand what *Miranda* warnings meant if they were given to him. However, Dr. Peterson acknowledged that DeCoteau would be able to understand when told he was free to leave an interview at any time.

On June 3, 2008, DeCoteau, was charged in a four-count indictment with aggravated sexual abuse of a child in violation of 18 U.S.C. §§ 1153 and 2241(c), and abusive sexual contact with a child in violation of 18 U.S.C. §§ 1153 and 2244(a)(5). See Docket No. 1. DeCoteau has moved

---

[1] Experts in the field of mental retardation seem to agree that IQ scores are not necessarily dispositive, and that such measurements of intelligence are one of several elements of the clinical definition of mental retardation.

to suppress statements he made to Agents O'Neil and Thomas. DeCoteau contends his statements were involuntary and made in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

## II.   <u>LEGAL DISCUSSION</u>

### A.   <u>CUSTODY UNDER MIRANDA</u>

DeCoteau contends the statements made to Agents O'Neil and Thomas were taken in violation of the Fifth Amendment because he was subject to custodial interrogation without being read his *Miranda* rights. DeCoteau argues that factors such as his mental limitations, his request for his grandmother's presence, and his repeated denial of inappropriate conduct with R.L. and S.S. render the interrogation custodial in nature.

In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the United States Supreme Court held that a person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444. In determining whether an individual is in "custody," a court must "examine the extent of the physical or psychological restraints placed on the [individual]" from an objective standpoint in light of the totality of the circumstances. <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990). The ultimate inquiry is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983).

Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

United States v. Hogan, 539 F.3d 916, 921 (8th Cir. 2008) (quoting Miranda, 384 U.S. at 444). "Miranda warnings are not required for '[g]eneral on-the-scene questioning as to facts surrounding a crime,' which does not present 'the compelling atmosphere inherent in the process of in-custody interrogation.'" United States v. Howard, 532 F.3d 755, 761 (8th Cir. 2008) (quoting Miranda, 384 U.S. at 477-78). The parties do not dispute that DeCoteau was subject to interrogation at the Belcourt Police Department. At issue is whether DeCoteau was in "custody" during the interrogation for purposes of *Miranda*.

To determine whether a defendant was in custody, the court should evaluate the totality of the circumstances which confronted the defendant at the time of the interrogation. United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004). "[T]he relevant inquiry is not whether any random reasonable person would have determined that he was in custody, but whether a reasonable person in the *defendant's position* would have considered his freedom of action restricted to the degree associated with a formal arrest." United States v. LeBrun, 363 F.3d 715, 723 (8th Cir. 2004). The court may look to the person's age, work experience, education, legal training, and past experience with law enforcement officers to make this determination. "[T]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." United States v. New, 491 F.3d 369, 373 (8th Cir. 2007) (quoting United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990)).

The Eighth Circuit Court of Appeals has outlined six factors to be considered in determining whether an individual was held in custody: "(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the

officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning."  Griffin, 922 F.2d  at 1349.  The list is not exclusive and no one factor is dispositive.  United States v. Rainbow, 380 F. Supp. 2d 1071, 1076 (D.N.D. 2005).

In United States v. Bordeaux, 400 F.3d 548 (8th Cir. 2005), the Eighth Circuit considered whether a defendant with below-average intelligence was in custody for purposes of *Miranda*.  Law enforcement officers arrived at the defendant's residence to discuss allegations of sexual abuse of a child.  The officers asked the defendant whether he preferred to talk in his residence or in an unmarked law enforcement vehicle parked outside his residence.  The defendant chose to talk in the vehicle.  The defendant sat in the front passenger's seat, the agent sat in the driver's seat, and the investigator sat in the back seat.  The investigator and the officer were armed, but did not display their weapons during the interview.  The defendant was informed he was not under arrest, he would not be under arrest at the conclusion of the interview, his statements were voluntary, and he was free to stop the interview at any time.  Fifty minutes into the interview the defendant stopped the interview to use the bathroom.  After an hour and forty-five minutes into the interview, the defendant stopped the interview and requested the presence of an attorney.

The Eighth Circuit determined the defendant was not in custody despite his below-average intelligence.  The court said,

8

> We conclude that Mr. Bordeaux was not in custody.  The agent told Mr. Bordeaux that his participation in the interview was voluntary, that he could end the interview at any time, that he was not under arrest, and that he would not be arrested at the end of the interview.  He had unrestrained freedom of movement during the interview – the officers allowed him to go into the apartment building by himself in the midst of the interview.  He also was not subjected to any strong arm or deceptive tactics; no one menaced or tricked him.  Finally, notwithstanding his low IQ, it was not reasonable for him to believe that he was in custody: No great mental acumen was required to understand his situation.

Bordeaux, 400 F.3d at 560.  To determine whether DeCoteau was in custody at the time of the questioning, the Court must consider the *Griffin* factors and the totality of the circumstances that confronted DeCoteau at the time of questioning.  An analysis of each of the *Griffin* factors is necessary to assess whether *Miranda* warnings were required under the circumstances.

### B.    GRIFFIN FACTORS

The first *Griffin* factor to be considered is whether the suspect was informed during the interview that the questioning was voluntary, that he could ask the officers to leave, or that he was not considered under arrest.  It is undisputed that DeCoteau was specifically informed at the onset of the interview that he was not under arrest, he would not be arrested at the conclusion of the interview, and he was free to leave at any time during the questioning.  At the conclusion of the interview, DeCoteau was allowed to voluntarily leave.  The Court finds this factor weighs in favor of a non-custodial setting for *Miranda* purposes.

The second indicia of custody is whether the suspect possessed unrestrained freedom of movement during the questioning.  In United States v. Mottl, 946 F.2d 1366, 1367 (8th Cir. 1991), the Court found that questioning conducted at the FBI headquarters was a non-custodial setting even

though the suspect was led through an electronically locked door behind bulletproof glass and questioned behind a closed door.

In this case, the undisputed evidence demonstrates that DeCoteau voluntarily drove to the Belcourt Police Department to speak with Agents O'Neil and Thomas. DeCoteau drove to the police station with his grandmother and girlfriend, and left the station at the conclusion of the interview. The interview took place in Agent Thomas's office with the door left slightly ajar. Agent O'Neil informed DeCoteau at the onset of the interview that his statements were voluntary, he was free to leave at anytime, he was not under arrest, and he would not be under arrest at the conclusion of the interview. DeCoteau was reminded at least two additional times while giving a tape-recorded statement that the interview was voluntary and he was free to leave at anytime. DeCoteau was neither handcuffed nor physically restrained during the interview. The agents did not raise their voices, but rather talked to DeCoteau in a conversational manner. The entire interview lasted only thirty minutes. The Court finds that DeCoteau possessed unrestrained freedom of movement during the interview conducted by FBI Agent O'Neil. This factor weighs in favor of a finding that DeCoteau was not in custody during the interview process.

The third factor of a *Griffin* custody analysis is whether the suspect voluntarily acquiesced to official questioning or initiated contact with authorities. The undisputed evidence reveals that, DeCoteau spoke in a conversational manner with the law enforcement officers. The officers never threatened DeCoteau with force in order to obtain a "confession." DeCoteau did not refrain from answering the agents' questions. The Court finds that DeCoteau voluntarily acquiesced to questioning by FBI Agent O'Neil and this factor weighs in favor of a finding that DeCoteau was not in custody during the interview.

10

The fourth indicia, whether the agents employed strong arm tactics or deceptive stratagems during questioning, also weighs in favor of a finding that the interview was conducted in a non-custodial setting.  In United States v. Lebrun, 363 F.3d 715, 718 (8th Cir. 2004), FBI agents picked up the suspect at his place of employment, drove him in an unmarked police car to the station, and questioned him using psychological ploys.  The agents told Lebrun his financial resources would be drained through the trial process, his family's reputation would be ruined, the FBI had ample evidence against him, and brought a man posing as the victim's brother to the interview in order to get a confession out of Lebrun.  363 F.3d 715, 718.  However, the Court said the coercive aspects of a police interview are largely irrelevant and found the defendant was not in custody.  Id. at 722.

In this case, the undisputed evidence reveals the law enforcement officers spoke to DeCoteau in a conversational manner and the interview was cordial and professional.  DeCoteau does not contend the agents used any psychological ploys or deceptive stratagems during the interview.  The Court finds that FBI Agent O'Neil did not use any psychological ploys, deceptive stratagems, or strong arm tactics during the questioning of DeCoteau.  This weighs in favor of a finding that DeCoteau was not in custody during the interview.

The fifth *Griffin* factor is whether there was a police-dominated atmosphere.  In United States v. Mottl, the Court found that two agents questioning the suspect at FBI headquarters was not a police-dominated environment because the agents did not catch Mottl by surprise in his home nor removed family members who might have lent moral support.  946 F.2d 1366, 1370.  Here, DeCoteau voluntarily drove to the Belcourt Police Department for the interview.  None of the agents were dressed in uniform.  None of the agents exposed their weapons.  The Court finds the interview did not occur in a police-dominated environment.  The law enforcement officers treated DeCoteau

11

in a professional and respectful manner and the interview was not lengthy.  This finding weighs in favor of a non-custodial setting.

The remaining factor of a *Griffin* custody analysis is whether the suspect was arrested. Unlike the defendant in *Griffin*, DeCoteau was not placed under arrest during questioning or at the conclusion of the interview.   Instead, DeCoteau left the law enforcement center at the conclusion of the interview.  The Court finds this factor weighs in favor of a finding that the interview was conducted in a non-custodial setting.

The Court has carefully reviewed the entire record and considered the testimony of the witnesses who testified at the suppression hearing.  After applying the relevant inquiry set forth in *Griffin* and other precedents of the Eighth Circuit, this Court is unable to conclude that DeCoteau was in "custody" so as to trigger the protections of *Miranda*.   Based on the totality of the circumstances, the Court finds that DeCoteau was not in custody when interviewed by FBI Agent O'Neil and BIA Agent Thomas at the Belcourt Police Department on March 24, 2008.  DeCoteau was never handcuffed or restrained in any manner before, during, or after the interview.  FBI Agent O'Neil informed DeCoteau at the onset of the interview that he was not in custody, he was not under arrest, he would not be arrested following the interview, and he was free to terminate the interview at any time.  The interview was cordial and respectful.  At all times during the interview process, DeCoteau was treated in a professional manner.  A reasonable person under the circumstances of the interview would have felt free to terminate the interview and leave.  The Court expressly finds that DeCoteau was not in custody during the interview conducted by FBI Agent O'Neil and Agent Thomas in March 2008.

C.   **VOLUNTARINESS**

DeCoteau also contends the statements made to Agents O'Neil and Thomas were in violation of the Fifth Amendment. DeCoteau contends he is unable to read or write, and he has mental limitations. DeCoteau argues at the time of the interview he was under the guardianship of his mother, who has had full guardianship authority over him since his eighteenth birthday. DeCoteau contends the guardianship was based, in part, on his mental limitations, and the agents' refusal to allow his grandmother to be present during the interview tainted the voluntariness of his statements.

It is well-established that a defendant's confession cannot be used at trial if it is involuntary. United States v. Washington, 431 U.S. 181, 186-187 (1977); Michigan v. Tucker, 417 U.S. 433, 440-441 (1974). The constitutional test for voluntariness, as articulated by the Eighth Circuit, is whether "in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will." United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989); Winfrey v. Wyrick, 836 F.2d 406, 410 (8th Cir. 1987).

"Fundamental to our system of justice is the principle that a person's rights are violated if police coerce an involuntary confession from him, truthful or otherwise, through physical or psychological methods designed to overbear his will." Wilson v. Lawrence County, 260 F.3d 946, 952 (8th Cir. 2001). "'A statement is not voluntary if the totality of the circumstances shows the defendant's will was overborne,' and voluntary statements must not be the result of deception, intimidation, or coercion of the person giving the statement." United States v. Jimenez, 478 F.3d 929, 932-33 (8th Cir. 2007) (quoting United States v. Annis, 446 F.3d 852, 855 (8th Cir. 2006)). "The appropriate test for determining the voluntariness of a confession is whether the confession was extracted by threats, violence, or direct or implied promises, such that the defendant's will was

overborne and his capacity for self-determination critically impaired." United States v. Astello, 241 F.3d 965, 967 (8th Cir. 2001) (quoting United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995)); United States v. Brave Heart, 397 F.3d 1035, 1040 (8th Cir. 2005); United States v. Rainbow, 380 F. Supp. 2nd 1071, 1078 (D.N.D. 2005).

In essence, two factors must be considered in the voluntariness inquiry: the conduct of the law enforcement officers, and the capacity of the suspect to resist pressure to confess. United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995); United States v. Makes Room For Them, 49 F.3d 410, 415 (8th Cir. 1995); United States v. Bad Hand, 926 F. Supp. 891 (D.S.D. 1996). The "overborne will/totality of circumstances" test was clarified and refined by the United States Supreme Court in Colorado v. Connelly, 479 U.S. 157 (1986). The Supreme Court emphasized that in confession cases, the crucial element has been the presence of "police overreaching." 479 U.S. at 163. The Supreme Court has made it clear that a confession is only involuntary if law enforcement officials use coercive activity to undermine the suspect's ability to exercise his free will. The Eighth Circuit has said that the "personal characteristics of the defendant are constitutionally irrelevant absent proof of 'coercion brought to bear on the defendant by the [Government].'" Sidebottom v. Delo, 46 F.3d 744, 758 (8th Cir. 1995).

The burden of proof on the issue of voluntariness is one of a preponderance of the evidence. United States v. Wright, 706 F.2d 828, 830 (8th Cir. 1983). The Government must establish by the preponderance of the evidence that a defendant's confession was voluntarily made. Therefore, in determining whether DeCoteau's statements were voluntary, the Court must consider the conduct of the law enforcement officers and DeCoteau's capacity to resist pressure and exercise his free will. United States v. Larry, 126 F.3d 1077, 1079 (8th Cir. 1997).

14

The Eighth Circuit has said the district court needs to consider a number of factors in determining whether an accused's will was overborne.  "[O]ne of the key concerns in judging whether confessions were involuntary, or the product of coercion, [is] the intelligence, mental state, or any other factors possessed by the defendant that might make him particularly suggestible, and susceptible to having his will overborne."  United States v. LeBrun, 363 F.3d 715, 726 (8th Cir. 2004) (quoting Wilson, 260 F.3d at 952)).  Age, education, and experience with the criminal justice system are also factors which are considered in determining whether a confession was voluntary.  See United States v. Astello, 241 F.3d 965, 968 (8th Cir. 2001) (finding that the defendant's confession was voluntary because the defendant was eighteen years old, had completed the eleventh grade, and had experience with law enforcement officers as a result of two prior arrests).

The Eighth Circuit has also concluded that where a defendant possesses at least average intelligence, his statements to law enforcement are not compelled.  See United States v. Gallardo-Marquez, 253 F.3d 1121, 1123, 1124 (8th Cir. 2001) (finding the confession voluntary where the defendant was of average intelligence and had prior experience with law enforcement); Simmons v. Bowersox, 235 F.3d 1124, 1133-34 (8th Cir. 2001) (determining the defendant's confession was voluntary because he had a full-scale IQ of 88, had acknowledged on videotape he understood his rights and had not been coerced by law enforcement officers, and had previously been arrested on a prior occasion); Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988) (finding the confession voluntary where the defendant had an IQ of 89, the interrogation lasted seven and one-half hours, and the interrogators made implied promises of leniency for confessing).  Further, a defendant's "inability to read and write does not necessarily render his confession involuntary.  A confession will be considered involuntary only if the defendant's will was overborne, law enforcement officers

15

acted improperly, or the confession was not the product of a rational intellect." <u>Howard v. Caspari</u>, 99 F.3d 895, 898 (8th Cir. 1996).

It appears the heart of DeCoteau's argument is that his incriminating statements were involuntary because of his low intelligence. According to clinical psychologist Dr. Peter C. Peterson, DeCoteau had a verbal IQ of 56, a performance IQ of 67, and a full-scale IQ of 57, which placed him in the mild mental retardation range of intellectual ability. The defendant's low IQ is of concern to the Court.[2]

There are a number of reported decisions in which federal courts have addressed the subject of a defendant's IQ as it relates to the voluntariness of a confession. In those cases the Eighth Circuit and other courts of appeal have generally held that the confessions were voluntary. <u>See</u> <u>United States v. Makes Room For Them</u>, 49 F.3d 410, 412-415 (8th Cir. 1995) (defendant with average or lower than average intelligence and an eighth grade education); <u>United States v.</u> <u>Chischilly</u>, 30 F.3d 1144, 1147-1148, 1151( 9th Cir. 1994) (defendant with a verbal IQ of approximately 62 and a functional level of a five or six-year-old child); <u>United States v. Frank</u>, 956 F.2d 872, 875-78 (9th Cir.1991) (defendant with "low average" intelligence who suffered from relatively mild depression), <u>cert.</u> <u>denied</u>, 506 U.S. 932, 113 S.Ct. 363, 121 L.Ed.2d 276 (1992); <u>Derrick v. Peterson</u>, 924 F.2d 813, 815-819 (9th Cir.1990) (defendant with an IQ of between 62 and 74 in the borderline range of mental retardation), <u>cert.</u> <u>denied</u>, 502 U.S. 853, 112 S.Ct. 161, 116 L.Ed.2d 126 (1991); <u>United States v. Macklin</u>, 900 F.2d 948, 950-53 (6th Cir. 1990) (one defendant

---

[2] The defendant was present at the suppression hearing on March 11, 2009, but he did not testify. Therefore, the Court did not have an opportunity to observe the defendant and fully judge his ability to comprehend. The evidence did reveal that the defendant was 24-years old; he had lived with his girlfriend and two minor children in an apartment in Belcourt since December 2007; he gambled in Belcourt and had a "player's card" at the local casino; and he had defied his family's requests that he have his girlfriend move out of the apartment at the Willow Manor Retirement Home or risk being evicted because he was required to live alone.

with an IQ of 59 was not able to read written instructions and had very severely limited capacity to understand verbal instructions, and another defendant with an IQ of 70 who was "just ever so slightly better off than mildly retarded"), cert. denied, 498 U.S. 840, 111 S.Ct. 116, 112 L.Ed.2d 86 (1990); Moore v. Dugger, 856 F.2d 129, 131-134 (11th Cir.1988) (defendant with an IQ of 62, who functioned at an intellectual level of an eleven-year-old and was classified as educable mentally handicapped); Dunkins v. Thigpen, 854 F.2d 394, 398-400 (11th. Cir.1988) (defendant who could not read and functioned at the high, mild range of mental retardation), cert. denied, 489 U.S. 1059, 109 S.Ct. 1329, 103 L.Ed.2d 597 (1989); Winfrey v. Wyrick, 836 F.2d at 407-12 (defendant with an IQ of 85 to 90, the mental age of about a fourteen or fifteen-year-old, with a 5th or 6th grade level of academic achievement); Vance v. Bordenkircher, 692 F.2d 978, 979-82 (4th Cir.1982) (defendant with an IQ of 62 and no lawyer present), cert. denied, 464 U.S. 833, 104 S.Ct. 114, 78 L.Ed.2d 114 (1983); Hall v. Wolff, 539 F.2d 1146, 1149-52 (8th Cir.1976) (defendant with a low order of intelligence); Coney v. Wyrick, 532 F.2d 94, 95-98 (8th Cir.1976); (defendant with "subnormal intelligence"); Fairchild v. Lockhart, 744 F. Supp. 1429 (E.D. Ark.1989) (defendant with an IQ of 63 and "mentally retarded"), aff'd, 900 F.2d 1292 (8th Cir. 1990), cert. denied, 497 U.S. 1052, 111 S. Ct. 21, 111 L.Ed.2d 834 (1990); see generally, Annot., Mental Subnormality of Accused as Affecting Voluntariness or Admissibility of Confession, 8 A.L.R.4th 16 (1981 & Supp.1995) (collecting federal and state cases).

DeCoteau contends he lacked the capacity to resist pressure from Agent O'Neil to confess. DeCoteau essentially argues he had a reduced capacity to resist pressure because of his limited mental capacity, his mother had guardianship over him on the date of the interview, and he could not read or write.

17

The undisputed evidence reveals that Agents O'Neil and Thomas allowed DeCoteau to voluntarily drive to the Belcourt Police Department to take part in the interview on March 24, 2008. The interview took place in Agent Thomas's office with the door left slightly ajar.  Agents O'Neil and Thomas were not dressed in uniform, nor did they display their weapons.  FBI Agent O'Neil informed DeCoteau at the onset of the interview that the interview was voluntary, he was not under arrest, he was free to leave at anytime, and he would not be arrested at the conclusion of the interview.  Even though DeCoteau later asked for his grandmother to be present during the interview, he said he understood the agents' policy prohibiting third parties from participating in interviews.  DeCoteau informed Agent O'Neil he could not provide a written statement because he was unable to read or write, but agreed to provide a tape-recorded version of his statement.  Twice during the recording, Agent O'Neil informed DeCoteau his statement was voluntary, he was free to leave, and he was not under arrest.  The interview lasted approximately thirty minutes.

The evidence further reveals that DeCoteau voluntarily gave a recorded statement to FBI Agent O'Neil.  At the time the interview was conducted, Agent O'Neil was aware DeCoteau was 24-years old and a high school graduate.  However, Agent O'Neil was neither aware of DeCoteau's guardianship status nor aware of his low IQ.  The evidence shows that Agent O'Neil spoke with DeCoteau in a polite and conversational manner and DeCoteau responded appropriately to the questions.  There is no indication from the record that DeCoteau expressed any difficulty in understanding the agent's questions or the circumstances surrounding the interview.  For all intents and purposes, DeCoteau's mental limitations were indiscernible to Agent O'Neil.  The record is devoid of <u>any</u> evidence that FBI Agent O'Neil <u>or</u> Agent Thomas ever made any threats, used deceptive practices, raised their voices, or acted in an inappropriate and unprofessional manner

18

towards DeCoteau.  Even assuming that DeCoteau, because of his low IQ, had a diminished capacity to resist pressure and avoid making inculpatory statements, his confession is admissible under <u>Connelly</u> and its progeny because of the total absence of coercive activity or overreaching on the part of the law enforcement officers involved in the interview.

After a careful review of the entire record, and assessing the credibility of the witnesses who testified at the suppression hearing, this Court is unable to find that any requisite coercive or overreaching misconduct was present on March 24, 2008, so as to render DeCoteau's confession involuntary.  There were no threats or promises that were ever made to DeCoteau and no evidence of any undue influence or pressure exerted on him.  The duration, tone, and overall atmosphere of the interview was neither hostile nor coercive.  According to Dr. Peterson, DeCoteau was capable of understanding that the was not under arrest, he was free to leave at anytime, and he would not be arrested at the conclusion of the interview.  The conduct of FBI Agent O'Neil was at all times professional and did not resemble or even approach the coercive police conduct present in <u>Blackburn v. Alabama</u>, 361 U.S. 199 (1960), or any of the involuntary confession cases cited in <u>Connelly</u>.  <u>See</u> 479 U.S. at 164-165.  The Government has met its burden of proof and has shown, by the preponderance of the evidence, that the defendant's confession was voluntarily made.

Based on the totality of the circumstances, the Court finds the admissions made by Kyle DeCoteau to FBI Agent Ryan O'Neil on March 24, 2008, were voluntary and were not the product of coercive interrogation or overreaching on the part of Agent O'Neil or BIA Special Agent Wayne Thomas.

19

III.   **<u>CONCLUSION</u>**

Based on the foregoing, the Court, in its discretion, finds that the defendant, Kyle DeCoteau, made knowing and voluntary statements to Agents O'Neil and Thomas, and DeCoteau's will was not overborne.  The Court also finds that DeCoteau was not in "custody" for purposes of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), at the time the statements were made to the law enforcement officers at the Belcourt Police Department on March 24, 2008.

For the reasons set forth above, the Court **DENIES** the Defendant's Motion to Suppress Evidence (Docket No. 33).

**IT IS SO ORDERED**.

Dated this 17th day of March, 2009.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court
